IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRY L.S. DORSEY,   *

   Plaintiff,   *

v.   *   Civil Action No. GLR-15-3645

WARDEN BOBBY P. SHEARIN, et al.,   *

   Defendants.   *

*****

# MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Warden Bobby P. Shearin, Warden Frank Bishop, Jr.,[1] and Chaplain Kevin Lamp's Renewed Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment (ECF No. 36). Also pending before the Court is Plaintiff Terry L.S. Dorsey's Motion to Appoint Counsel. (ECF No. 43). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant Defendants' Motion and deny Dorsey's Motion.

## I.    PROCEDURAL BACKGROUND[2]

Dorsey is an inmate at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. On November 30, 2015, Dorsey sued Defendants, asserting that

---

[1] Frank Bishop is presently Warden at NBCI. He served as Warden at NBCI from February 18, 2014, until he was appointed Acting Assistant Commissioner of the Division of Correction ("DOC") in December of 2014. Bishop returned to NBCI as Warden on April l, 2015. (Bishop Decl. ¶ 2, ECF No. 36-4).

[2] The Court provided the factual background of this case in its March, 2017 Memorandum Opinion (ECF No. 31). The Court repeats only facts relevant to the pending dispositive Motion.

they violated his right to practice religion and retaliated against him for exercising his rights under the First Amendment to the United States Constitution. (ECF No. 1). Construing Dorsey's Complaint liberally, the Court also identified a possible claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a) (2018). (Mar. 17, 2017 Mem. Op. at 10, ECF No. 31).

On July 11, 2016, Defendants filed a Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment. (ECF No. 17). On March 17, 2017, the Court denied Defendants' Motion Summary Judgment subject to renewal and supplementation within 30 days. (ECF No. 32). The Court requested that Defendants supplement their renewed Motion to address: (1) whether Dorsey exhausted his administrative remedies; (2) the reasons for his reclassification; (3) how restrictions on Maximum II level inmates are reasonably related to legitimate penological interests; and (4) Dorsey's assertions that Defendants violated RLUIPA. (Mar. 17, 2017 Mem. Op. at 7, 9, 10).

On May 17, 2017, Defendants filed a Renewed Motion to Dismiss Plaintiff's Complaint or, in the Alternative, for Summary Judgment (ECF No. 36), to which Dorsey filed two Oppositions. (ECF Nos. 40, 41).[3] On February 26, 2018, Dorsey filed a Motion to Appoint Counsel. (ECF No. 43).

## II. DISCUSSION

### A. Motion to Appoint Counsel

In his Motion, Dorsey states that he requires counsel because his imprisonment

---

[3] The Court is mindful that Dorsey is a pro se litigant and has considered both Oppositions.

2

limits his ability to litigate, the issues in this case are complex, he has limited access to a law library, and a trial is likely to involve conflicting testimony. "A pro se prisoner does not have a general right to counsel in a § 1983 action." Evans v. Kuplinski, 713 F.App'x 167 (4th Cir. 2017). A federal district court judge's power to appoint counsel under 28 U.S.C.§1915(e)(1) (2018) is discretionary, and an indigent claimant must present "exceptional circumstances." See Kuplinski, 713 F. App'x 167; Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel).

Here, Dorsey has adequately articulated his claims and filed Oppositions to Defendants' dispositive Motion. Further, his claims are not unduly complex, and for reasons to follow, a trial is not necessary to resolve this matter. Thus, the Court concludes that exceptional circumstances do not exist in Dorsey's case. Accordingly, the Court will deny Dorsey's Motion.

**B.     Defendants' Renewed Motion**

**1.     Standard of Review**

In considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. See Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783 (4th Cir. 1999) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.

1993)). But "[w]hen matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998) (quoting Fed.R.Civ.P. 12(d)). Under Rule 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

In reviewing a motion for summary judgment, the Court must draw all justifiable inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48.

A "material fact" is one that might affect the outcome of a party's case. Id. at 248; see JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (quoting Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993).

Defendants rely on exhibits attached to their Motion. Likewise, Dorsey relies on exhibits attached to his Oppositions. Because the Court will consider Defendants' and Dorsey's exhibits, the Court must convert the Motion to a motion for summary judgment.[4]

## 2. Analysis

Defendants assert five arguments as to why that they are entitled to summary judgment: (1) Dorsey has not exhausted his administrative remedies; (2) Dorsey's security reclassification was not a retaliatory action; (3) there was no violation of the Free

---

[4] "[N]o formal notice of conversion by the district court is required in cases where it is apparent that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion—for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion." Carter v. Balt. Cty., 39 F.App'x 930, 933 (4th Cir. 2002) (per curiam).

Exercise Clause to the First Amendment; (4) there was no violation of RLUIPA; and (5) they are entitled to qualified immunity. The Court agrees with Defendants that Dorsey failed to exhaust his administrative remedies as to his retaliation claim and that Dorsey has not established a First Amendment or RLUIPA violation.

### a. Exhaustion of Administrative Remedies

If a claim has not been properly presented through the administrative remedy procedure ("ARP") it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e (2018). The PLRA provides, in pertinent part, that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Id. § 1997e(a) (2018).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." Id. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F. App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.

6

Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants.  See Jones v. Bock, 549 U.S. 199, 215–16 (2007); Anderson v. XYZ Corr. Health Servs., Inc., 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, the Court may not consider a claim that has not been exhausted.  See Bock, 549 U.S. at 220.  Exhaustion is required even if the relief sought is not attainable through resort to the administrative remedy procedure.  Booth v. Churner, 532 U.S. 731, 741 (2001).  In other words, exhaustion is mandatory.  Ross v. Blake, 136 S.Ct. 1850, 1857 (2016).  A court, therefore, ordinarily may not excuse a failure to exhaust.  Id. at 1856 (citing Miller v. French, 530 U.S. 327, 337 (2000)).

The administrative remedy process is designed so that prisoners pursue their administrative grievances until they receive a final denial of their claims, appealing through all available stages.  Chase, 286 F.Supp. at 530; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); Booth, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief").

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies.  Moore v. Bennette, 517 F.3d at 725, 729 (4th Cir. 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."  Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006).  This requirement is one of "proper exhaustion of administrative remedies,

7

which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford, 548 U.S. at 93 (emphasis in original) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. Chase, 286 F. Supp. 2d at 529–30. As a result, Dorsey must have exhausted his administrative remedies before bringing the instant action. Porter, 534 U.S. at 528.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for "inmate complaint resolution." See generally Md. Code Ann., Corr. Servs. ("CS"), §§ 10-201 et seq. (West 2018); Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." CS § 10-206(a).

DPSCS regulations concerning the administrative remedy procedures define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. See CS § 10-206(b); see also COMAR 12.07.01.02.D; OPS.185.0002.02.[5]

---

[5] OPS.185.0002 is an Executive Directive created by DPSCS, titled "Administrative Remedy Procedure (ARP)." Dep't Pub. Safety & Corr. Servs., OPS.185.0002, Executive Directive, Administrative Remedy Procedure (2015), http://itcd.dpscs.state.md.us/PIA/ShowFile.aspx?fileID=654. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" Goldfarb v. Mayor & City

8

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. CS § 10-206(b). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. See CS § 10-206(b); see also OPS.185.0002.02. There is an established administrative remedy procedure process that applies to all Maryland prisons. OPS.185.0002.02. Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" OPS.185.0002.05C(1), which is defined as "the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." CS § 1-101(k). In the DOC, each facility's warden is responsible for the ARP at the institutional level. OPS.185.0002.05E. An ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. OPS.185.0002.05J.

The second step in the ARP process occurs if the managing official denies a

---

Council of Balt., 791 F.3d 500, 508 (4th Cir. 2015); see also Fed.R.Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

prisoner's initial ARP.  The prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee.  OPS.185.0002.05L.  For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. Id.

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; CS §§ 10-206(a), 10-210; COMAR 12.07.01.05B.  When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.  CS § 10-207(b)(1); see COMAR 12.07.01.07B.  An order of dismissal from the IGO constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  CS § 10-207(b)(2)(ii).  If the IGO concludes that a hearing is necessary, however, the hearing is conducted by an Administrative Law Judge ("ALJ") with the Maryland Office of Administrative Hearings ("OAH").  See CS § 10-208(2)(c); COMAR 12.07.01.07-.08.  The conduct of such hearings is governed by statute.  See CS § 10-208; COMAR 12.07.01.07D; see also Md. Code Ann., State Gov't §§ 10-101 et seq. (West 2018).

A decision of the ALJ denying all relief to the inmate is considered a final agency determination.  CS § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A.  But, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision

constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the ALJ's proposed decision. See CS § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his or her remedies. See CS § 10-210. An inmate need not, however, seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement. See, e.g., Pozo, 286 F.3d at 1024.

Here, Dorsey's ARP records demonstrate that he failed to exhaust the available administrative remedies with regard to his retaliation claim. On August 26, 2014, he filed ARP NBCI-2406-14 asserting that his First Amendment rights were violated when he was placed on Maximum II status, preventing him from attending religious services. (Apr. 1, 2016 Durst Decl. at 8, ECF No. 17-3). Dorsey did not pursue this ARP to the IGO as required to exhaust his administrative remedies. (Neverdon Decl. at 2, ECF No. 36-2).

On May 18, 2015, Dorsey filed ARP NBCI-0986-15 complaining that he has not been able to attend religious services because he is classified as a Maximum II security inmate. (Dorsey Decl. at 17–18, ECF No. 24-1).[6] On August 24, 2015, Dorsey filed IGO

---

[6] On August 19, 2014, Dorsey's security classification was increased to Maximum I to Maximum II security status based on his adjustment history which includes ten infractions for possession of a weapon, seventeen infractions for tampering with security equipment, and seven infractions for using threatening language. (Apr. 21, 2017 Durst Decl. at 1, ECF No. 36-3). Dorsey was and continues to be a validated member of the "Bloods," a security threat group. (Id.). Dorsey's reclassification was later reversed after an ALJ found the decision arbitrary and capricious because the review process did not follow DOC policy and Maryland procedure. (Dorsey Decl. at 19–29). Of note, the ALJ

11

grievance No. 20151510 from the disposition of ARP NBCI-0986-15, claiming that he was denied his right to practice religion. (Neverdon Decl. at 3–30). The grievance was sent to OAH, and a hearing was scheduled for November 4, 2014. (Id. at 21). On October 28, 2015, Dorsey withdrew the grievance and it was dismissed as moot.[7] (Id. at 28–30).

On March 29, 2016, Dorsey filed a grievance with the IGO from the Warden's disposition of ARP NBCI-2424-15. (Id. at 31–32). In his grievance, Dorsey alleged that Native American Services offered at NBCI do not include practices of the Blackfoot Tribe. (Id. at 31, 32, 44). Dorsey's grievance does not, however, allege that he was placed in Maximum II security in retaliation for filing a grievance regarding Native American religious services at NBCI. Robin Woolford, Deputy Director of the IGO dismissed the grievance because she learned from Chaplain Lamp that the Native American services at NBCI "meet the needs of all sects." (Neverdon Decl. at 44). Because Dorsey need not seek judicial review to exhaust, the Court concludes that he exhausted his administrative remedies for his First Amendment and RLUIPA claims, but not for his retaliation claim.

In sum, the record demonstrates that there is no dispute of material fact that Dorsey failed to present and exhaust through all levels of the administrative process his claim that he was placed in Maximum II security in retaliation for filing a grievance about the availability of Native American services. Accordingly, the Court will grant

---

did not consider or find any retaliatory animus in the reclassification decision. (Id.).

[7] Defendants do not raise lack exhaustion as an affirmative defense to Dorsey's Free Exercise claim.

Defendants' Motion as to Dorsey's retaliation claim.[8]

### b. The Free Exercise Clause

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Although incarcerated, a prisoner still "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 822 (1974). An inmate's right to religious exercise must be balanced with a prison's institutional needs of security, discipline, and general administration. Cutter v. Wilkinson, 544 U.S. 709, 722 (2005); O'Lone v. Estate of Shabazz, 482 U.S. 342, 348–49 (1987).

A regulation or management decision that substantially burdens an inmate's First Amendment right is valid if it is "reasonably related to legitimate penological interests." Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). This analysis requires determining:

> [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy

---

[8] Prisoners have a right under First Amendment "to file a prison grievance free from retaliation." Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017). Even if Dorsey had exhausted his retaliation claim, however, the facts alleged are insufficient to establish a First Amendment retaliation claim.

alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. (quoting Turner, 482 U.S. at 89–92). Under this test, the Court is required to give deference to prison administrators' policy explanations. See id. at 182 ("We confirm emphatically that any substantive explanation offered by the prison must be viewed with due deference."). Maintaining institutional safety and security are compelling state interests. Cutter, 544 U.S. at 722–23.

Here, there is no dispute of material fact that NCBI's policies governing prisoners' religious practices are reasonably related to a legitimate penological interest. Bishop avers that NBCI inmates who are on Maximum II security status are not permitted to associate with any group other than Maximum II inmates due to safety and security concerns. (Bishop Decl. ¶ 4). Bishop further avers that NBCI inmates on segregation do not attend congregate services due to safety and security concerns.[9] (Id.). He explains that the DPSCS Division of Correction (DOC) Religious Services Manual, DCM 140-001, which governs how NBCI provides religious services and assistance to inmates provides for weekly worship and study forums unless the religion calls for less frequent gatherings or institutional resources cannot accommodate weekly congregation. (Id.; see also Religious Services Manual ["DCM 140-001"], ECF No. 36-4 at 9–19). Two

---

[9] Dorsey was on Maximum II security status from August 19, 2014 to October 15, 2015. (Apr. 21, 2017 Durst Decl. at 1). Dorsey was in segregation housing for much of this time, from September 26, 2014 to January 15, 2015. (ECF No. 17-4 at 9–12. 14–16). Dorsey was issued passes to attend Native American worship on August 26 2014; September 2, 9, 16, and 23, 2014; November 3, 10, 17, and 24, 2015; and December 1, 8, 22, 29, 2015. (ECF No. 17-3 at 12–21).

14

prisoners constitute a group for group worship and study forums. (DCM 140-001(VI)(B)(1)(3) at 14).

Similarly, Chaplain Lamp states that, due to security concerns, no inmate on segregation is allowed to attend congregate religious services at NBCI. (Lamp Decl. ¶ 4, ECF No. 36-6). Lamp states that general population inmates housed on Maximum I or Maximum II security are allowed congregate religious services. (Id. ¶ 5). Additionally, due to security concerns associated with Maximum II inmates, the congregate religious services for Maximum II inmates are limited to eight participants. (Id.). If more than eight Maximum II participants request a particular congregate service, then NBCI provides additional services. (Id.). At the time Dorsey was housed on Maximum II security, there were no other Maximum II inmates at NBCI who were requesting a Native American congregate religious service. (Id. ¶ 6).

The record establishes that Dorsey's security classification as either Maximum I or Maximum II had no bearing on his ability to attend religious congregation services. Rather, it was Dorsey's segregation status for disciplinary concerns that largely precluded his attendance at group worship.[10] Dorsey was in segregation housing for much of the time he was on Maximum II status. When he was in Maximum II status, he was the sole inmate who asked to hold a Native American service—and the Religious Service Manual

---

[10] In his first Opposition, Dorsey alleges that Defendants denied him religious counseling from Iron House volunteers and literature related to his religious beliefs. A plaintiff "bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint") See Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997), aff'd, 141 F.3d 1162 (4th Cir. 1998). Accordingly, the Court declines to address Dorsey's allegations.

requires two prisoners to constitute a group for group services. When Dorsey was in the general population, including when he was on Maximum II status, he was permitted to join congregate services. See supra n.9.

In sum, Defendants show there was a valid, rational connection between the limits congregate worship and legitimate penological objectives. See Sweet v. S.C. Dep't of Corr., 529 F.2d 854, 860 (1975). Accordingly, Dorsey has failed to establish a violation of the Free Exercise Clause and the Court will grant Defendants' Motion as to this claim.

    **c.**    **RLUIPA**

RLUIPA prohibits government officials from imposing a substantial burden on an inmate's religious exercise unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). A substantial burden on religious exercise occurs when a government, by act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace, 472 F.3d at 187 (quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 717, 718 (1981)). "Although RLUIPA must 'be construed in favor of a broad protection of religious exercise,' it must be applied 'with particular sensitivity to security concerns.'" Couch v. Jabe, 679 F.3d 197, 201 (4th Cir. 2012) (internal citation omitted) (quoting Cutter, 544 U.S. at 722). "In this regard, 'RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety.'" Id. (alteration in original) (quoting Cutter, 544 U.S. at 722).

The plaintiff bears the initial burden of establishing that the government's actions

16

substantially burdened his exercise of religion. See, e.g., Krieger v. Brown, 496 F.App'x 322, 324 (4th Cir. 2012). If the plaintiff satisfies his burden, the government must then prove that the challenged policy is the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000cc-1(a). RLUIPA defines the term "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Id. § 2000cc-(7)(A).

Here, besides alleging that Shearin denied him access to ceremonial tobacco, Dorsey has failed to identify the religious exercise that has been adversely impacted by Defendants' conduct. To the extent that the denial of ceremonial tobacco could be construed as adversely impacting Dorsey's religious rights, he does not explain why this denial was a substantial burden.[11] Thus, Dorsey fails to establish a RLUIPA claim against Defendants. See Krieger, 496 F.App'x 322, 325 (4th Cir. 2012). Accordingly, the Court will grant Defendants' Motion as to Dorsey's RLUIPA claim.

## III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Renewed Motion to Dismiss Plaintiff's Complaint, or in the Alternative, for Summary Judgment (ECF No. 31). A separate Order follows.

Entered this 30th day of March, 2018.

/s/
George L. Russell, III
United States District Judge

---

[11] Iron House offers a "pipe ceremony" as part of its service. (Beitzel Decl. ¶ 5, ECF No. 36-7). If Dorsey went to congregant services, he would have been able to consume ceremonial tobacco.